Receipt number 9998-5153734

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| TPMC-ENERGYSOLUTIONS<br>ENVIRONMENTAL SERVICES 2008, LLC, | ) ) ) | 19-102 C |
| **Plaintiff,** | ) ) | **CIVIL ACTION**<br>**NO.:** _____ |
| v. | ) ) | |
| THE UNITED STATES OF AMERICA, | ) | |
| **Defendant.** | | |

## COMPLAINT

Plaintiff, TPMC-Energy Solutions Environmental Services 2008, LLC ("TES"), by and through its counsel, files this Complaint as set forth below:

### PARTIES

1.      Plaintiff, TPMC-Energy Solutions Environmental Services 2008, LLC ("TES"), is a SBA approved Mentor-Protégé Joint Venture and a Pennsylvania limited liability company with its principal place of business in Exton, Pennsylvania.

2.      Defendant is the United States of America ("Government") acting by and through the Department of the Army, Army Contracting Command-Rock Island.

### JURISDICTION

3.      This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. §§ 7101-09.

49426738.1

## BACKGROUND

Contract

4.      On November 9, 2010, the Department of the Army, Army Contracting Command-Rock Island ("ACC-RI"), awarded Contract No. W52P1J-11-D-0001 to TES ("Contract").

5.      The Contract was a firm-fixed price three (3) year Indefinite-Delivery Indefinite-Quantity ("IDIQ") service contract.

6.      The Contract called for site remediation services for the free release/decommissioning and license termination of the Beltsville Agricultural Research Center ("BARC") Low-Level Radioactive Burial Site ("LLRBS") located in Beltsville, MD.

7.      The Contract called for the ACC-RI to award task orders for nine (9) specific tasks spelled out in the Performance Work Statement ("PWS") utilizing agreed to prices.

8.      The Contract incorporated the following pertinent attachments:

Attachment 0001: Performance Work Statement (PWS), 17 August, 2009

Attachment 0003: Quality Assurance Surveillance Plan (QASP), 12 October, 2015

Attachment 0004: Draft Decommissioning Plan, dated July, 2009

Attachment 0005: TES's Proposal, dated 11 December, 2009

Attachment 0006: Open Discussion Q & A

9.      The Contract called for the successful contractor to perform all work and the final radiological release survey within the guidelines of three (3) key documents: the draft Decommissioning Plan ("Draft DP"), Final Site Survey Plan ("FSS"), and Site Characterization Survey ("SCS"), which was also known as the Waste Characterization Survey ("WCS").

49426738.1

10.     The Contract also stated the final Decommissioning Plan ("Final DP") would be incorporated upon approval from the Nuclear Regulatory Commission ("NRC").

11.     The Solicitation contained a scope of work that was described in the Performance Work Statement ("PWS") dated August 17, 2009.

12.     The PWS outlined nine (9) specific tasks with objectives and requirements to be achieved by methods to be determined by the contractor.

13.     The PWS stated, "[T]he contractor shall perform all work and the final radiological release survey within the guidelines of the attached Decommissioning Plan (DP) . . .."

14.     The nine (9) specific tasks were:

• (Task 1) Work Plan: "The (Work Plan) WP shall describe how the contractor plans to perform the specific work described in the draft DP."

• (Task 2) Mobilization/Demobilization: "The Contractor shall initiate the process of mobilizing equipment, material, and personnel to the project site NLT one day following the approval of the WP and as authorized by the contracting officer . . . Conformance to the approved DP, WP and the project schedule shall serve as the basis for measuring task performance."

• (Task 3) Site Remediation: "Excavate, and backfill the excavated areas in accordance with the approved DP and WP . . . The contractor shall remediate all areas identified in the decommissioning plan in accordance with the determined site-specific limits."

49426738.1

- (Task 4) Site Sampling: "Sample, and segregate contaminated soil, liquids, mixed waste, etc., to facilitate proper packaging and to identify the appropriate disposal option/site in accordance with the approved DO and WP."

- (Task 5) Packaging/Staging: "Package, containerize, stage and prepare to transport contaminated soil, liquids, mixed waste, etc., to the appropriate disposal site in accordance with the approved DP and WP."

- (Task 6) Transport Contaminated Soil, Mixed Waste and LLRW to the Appropriate Treatment/Disposal Facility: "The Contractor shall receive the staged material at the final loading facility, and transport the contaminated material to the appropriate disposal/treatment facility."

- (Task 7) Treatment/Disposal: "The contractor shall arrange for all waste streams to be treated/disposed of at the appropriate disposal facility."

- (Task 8) Final Status Survey Report (FSSR): "Submit an acceptable FSSR in a timely and efficient manner that conforms to task requirements and applicable standards. All surveys required to prepare the FSSR will be performed during this project phase."

- (Task 9) Human Health Baseline Risk Assessment (BRA): "Conduct limited Human Health Baseline Risk Assessment (BRA)."

Draft DP

15.    The PWS made the Draft DP a part of the Solicitation.

16.    The incorporated Draft DP was titled "Revised Final Decommissioning Plan" and dated July 2009.

49426738.1

17.    A decommissioning plan was required because no NRC approved procedures for decommissioning of the LLRBS has been previously made part of the license conditions.

18.    NRC was the agency of the Government that licensed the LLRBS.

19.    Compliance with the Draft DP was required to obtain license termination, which was another overlying requirement of the PWS.

20.    Cabrera Services developed the Draft DP.

21.    The Draft DP was developed for the USDA in support of decommissioning activities and license termination at the LLRBS.

22.    The Draft DP described the LLRBS, its operating history, radiological status, and dose modeling evaluations.

23.    The Draft DP also outlined the planned decommissioning tasks or activities to be performed, along with supporting decommissioning project management and organization, health and safety program, radioactive waste management, quality assurance, facility radiation surveys, and financial assurance.

24.    The Draft DP showed the LLRBS as a 5,700 m$^2$ (1.4 acre) fenced area containing two contiguous fields, the North Field and South Field.

25.    As to burial pits, the Draft DP stated, "ARS records indicate a total of 50 pits were designated as waste burial pits (Apex, 1993)."

26.    The Draft DP then stated, "Information derived from the Engineering Evaluation/Cost Analysis (EE/CA) conducted in 2000 and the waste characterization survey (WCS) performed in 2006 has led to the conclusion that only 46 out 50 potential burial pits were used for disposal of 33,000 cubic feet of waste (ENTECH 2000, Cabrera 2007)."

27.     As to the timing of the work, the Draft DP represented "[t]he decommissioning process is to be completed within two years, unless an alternative schedule is approved (NRC, 2006)."

28.     The Draft DP then outlined the specific steps.

29.     The Draft DP noted "[t]his DP documents the plan of execution for decommissioning of the LLRBS . . . A site-specific risk assessment has been performed, and documented in this DP and is used to derive cleanup criteria for each of the potential radionuclide containments.  Some important inputs to the risk assessment include: 1) the radionuclides of concern and their mobility; 2) the volume of contaminated soil and concentration of contaminants (especially in the vadose zone, because a removal action should virtually eliminate the source term burials); 3) depth to groundwater; and 4) other physical parameters."

30.     The Draft DP discussed the WCS by noting "[i]n 2006 CABRERA conducted a waste characterization survey in accordance with 'Characterization Survey Work Plan, Low Level Radioactive Burial Site Beltsville Agricultural Research Center (BARC)', (CABRERA, 2004)."

31.     The Draft DP outlined how the WCS was implemented.

32.     The Draft DP then noted "[b]ased on data collected during the Characterization Survey, the DP has been updated."

33.     As to the dimensions of the pits, the Draft DP represented "[t]he pits are approximately 10 ft wide by 12 ft long by 10 ft deep and are separated approximately 6 ft

horizontally from one another.  Each pit was reportedly backfilled to surface grade with at least 5 ft of clean fill."

34.    The Draft DP described how the waste was disposed.

35.    For instance, "[t]ypes of containers disposed, according to files, are cardboard boxes of 1 to 4 cubic ft, 1- to 5-gallon containers for liquids, plastic milk jugs, plastic carboys, solvent bottles, fiberboard drums, and 55-gallon drums.  Liquid containers were placed in cardboard boxes, usually 4 to a box."

36.    The Draft DP also represented "[l]iquid scintillation vials were either placed on vial trays and packaged in cardboard boxes for disposal, or placed loose in large plastic bags, then in cardboard boxes."

37.    Section 1.5 was titled "Prior Onsite Burials."

38.    Section 1.5 stated, "See Section 1.1 for detailed description of on-site burial activities. All onsite burials are limited to those in the LLRBS.

39.    Section 1.1 contained a schematic and detailed inventory listing the radionuclides that were disposed in each of the forty-six (46) pits.

40.    These documents included the activity in millicuries, whether the disposed materials were solid, liquid, vials of liquid scintillation materials, other chemicals, and the date each pit was closed.

41.    The types of radioactive waste material at the LLRBS consisted of $H^3$, $C^{14}$, $Cs^{137}$, $CI^{36}$, $P^{32}$, $Ni^{63}$, $Ra^{226}$, $Pb^{226}$, and other radionuclides.

42.    Some of the radiological materials deposited in the LLRBS were considered to be short-lived (i.e., having a short radiological half-life), including $P^{32}$ and $PO^{210}$.

43.    The schematic in Section 1.1 also listed in which pits liquid scintillation vials ("LSVs") were disposed and the number of LSVs disposed in each pit.

44.    Section 3.4 was titled "Surface Soil Contamination" and stated, "Based on historical records provided by the BARC and the 2006 Characterization survey, the top five feet of overburden associated with each burial pit is considered uncontaminated soil. There is no known surface contamination."

45.    Section 5.0 was titled, "PLANNED DECOMMISSIONING ACTIVITIES."

46.    One paragraph in Section 5.0 stated:

Results of the 2006 WCS were used to estimate the volume of wastes remaining at the LLRBS. The footprint of the rectangle composing the North Field of the LLRBS is 200 ft long and 150 ft wide. A total of 46 waste cells are in this area, and each is approximately 12 ft long and 10 ft wide. Each cell is separated from neighboring cells by sidewalls that are 5 feet thick. There is a 5 ft thick layer of clean overburden over each cell, beneath which is a 5 ft thick layer of waste. The ex-situ volume of waste is estimated to be approximately 1040 CY, comprised of approximately 600-660 CY of waste soil, 200-240 CY of contaminated debris, 80-100 CY of LSC vials, 80-100 CY of dry active waste, and 10-12 CY of bulk liquids. It may be technically impracticable to segregate and clear the interior sidewalls and separate the waste cells from each other. Adding the volume of the soil in the sidewalls to the volume of the waste increases the total ex-situ volume of waste to approximately 6600-7300 CY.

47.    Section 5.0 of the Draft DP then listed specific decommissioning tasks to be performed.

FSS and WCS

48.    The FSS was made a part of the Solicitation, which was titled "Low Level Radiation Burial Site Final Status Survey Design Plan" and dated October 2008.

49.    The FSS was prepared in support of LLRBS decommissioning activities and license determination to provide Multi-Agency Radiation Survey and Site Investigation Manual

outlining a consistent approach for planning, performing, and assessing the radionuclides of

concern present at the LLRBS through final status surveys in order to demonstrate compliance

with established dose and risk-based criteria Derived Concentration Guideline Level.

50.     The WCS made a part of the Solicitation, which was titled "Draft Final Low

Level Radiation Burial Site Waste Characterization Survey" and was dated July 2008.

51.     The WCS was prepared in support of LLRBS decommissioning activities to

provide geophysical surveys to map the size and location of the waste pits, gamma and beta

walkover surveys, and groundwater sampling to assess contaminant migration away from the

disposal area, as well as the excavation, characterization, and packaging of waste materials in

four (4) out of the forty-six (46) burial pits.

52.     During the WCS, four (4) out of the forty-six (46) burial pits were selected for

excavation based on the inventory.

53.     Waste materials encountered during excavation and characterization included

laboratory trash, LSVs, radioactive sources, bulk soils containing small amounts of waste or

debris not readily separable from soil, animal remains, and bulk liquids in their original

containers.

54.     The inventory of items excavated from these four (4) selected pits during the

study included a total 58.5 cubic yards of contaminated soil and debris, 4 fiber boxes of bones,

6.5 cubic yards of LSVs, 6.3 cubic yards of dry active waste, 0.5 cubic yards of bulked liquid

waste, 4 cubic yards of leachate, and 3 cubic yards of radioactive sources.

55.     As to the dimensions of the pits, the WCS represented "[t]he pits are reported to

be approximately 10 ft wide by 12 ft long by 10 ft deep and are separated approximately 6 ft

9

horizontally from one another. Each pit was reportedly backfilled to surface grade with at least 5 ft of clean fill."

56.    As to LSVs, the WCS represented "[l]iquid containers were placed in cardboard boxes, usually four to a box."

Development of Proposal and Methodology for Excavation and Remediation

57.    TES developed its proposal, including technical approach, schedule, and pricing, based on the scope of work outlined in the PWS and the in-place waste described in the Draft DP and WCS.

58.    In particular, TES heavily relied on the Draft DP to develop its technical approach because it was the key document that had to be followed to achieve the project objective of NRC license termination and unrestricted release for the LLRBS.

59.    The Draft DP was submitted by the USDA to the NRC as part of decommissioning the LLRBS.

60.    The Draft DP also was the most recent document prepared on behalf of the USDA.

61.    The Draft DP, therefore, contained the best information the USDA and Government possessed associated with the LLRBS.

62.    TES primarily relied on the waste quantities, distribution, and nature and extent presented in the Draft DP in developing the site conceptual model and technical approach.

63.    TES also relied on the WCS in developing the site conceptual model and technical approach.

64.     Finally, TES asked extensive questions to the ACC-RI before submission of its proposal, and the ACC-RI provided answers that further supported TES' site conceptual model and technical approach.

65.     TES relied on such answers in developing its proposal, including, but not limited to, the site conceptual model and technical approach.

66.     As noted above, the North Field at the LLRBS was described to be a fenced area with a rectangular footprint, 200 ft. long and 150 ft. wide (30,000 ft$^2$).

67.     Within this area there were a total of forty-six (46) waste cells or pits, each pit with an approximate dimension of 10 ft. wide by 12 ft. long by and 10 ft. deep, and separated approximately 6 ft. horizontally from one another.

68.     Four (4) of the waste pits had been excavated during the WCS.

69.     The Contract called for TES to excavate and remediate the North Field at the LLRBS and its remaining forty-two (42) waste pits to meet the required end-state of the NRC's release criteria for the LLRBS.

70.     TES presented in its proposal the planned technical approach for carrying out site remediation field work using nine (9) phases based on the detailed physical description of the LLRB portrayed in the Solicitation and its incorporated documents, as well as its experience in executing projects of similar size and scope with NRC and Environmental Protection Agency ("EPA") requirements.

71.     Each phase was associated with a distinct horizontal zone defining the specific excavation area.

72.     Zone 1 encompassed the clean overburden from the ground surface to a depth of approximately five (5) ft. below the ground surface.

73.     Zone 2 included forty-two (42) waste pits and the sidewalls separating each individual waste pit nominally between five (5) and ten (10) ft. below the ground surface.

74.     Zone 3 consisted of native soils underlying the waste pits, potentially contaminated by waste infiltration and ranges from ten (10) ft. to fifteen (15) ft. below the ground surface.

75.     TES estimated the excavation volume associated with each zone based on the physical characteristics of the LLRB provided in the Solicitation and its incorporated documents, especially the Draft DP.

76.     After bulk removal of the Zone 1 material, TES planned to precisely excavate and remediate the forty-two (42) waste pits in Zone 2 and then bulk excavate remaining underlying soils in Zone 3.

77.     TES planned schedule showed the nine (9) phases would require twenty-two (22) weeks.

78.     The on-site excavation and remediation work was to be carried out in fourteen (14) weeks.

79.     TES' conceptual model and proposed technical approach were further validated when the Government reviewed and approved TES' work plans, incorporated TES' proposal into the Contract, and ultimately issued TES Delivery Order 0003 to perform the site remediation activities.

49426738.1

80.     TES planned to achieve the proposed excavation and remediation rates and durations using a combination of bulk soil excavation of the clean overburden (Zone 1) and underlying soils (Zone 3) and directed precision excavation to remove waste materials from the waste pits (Zone 2).

Initial Contract Performance

81.     When the Contract was awarded to TES on November 9, 2010, TES received Delivery Order ("DO") 0001, which authorized TES to perform Original PWS Task 1: Work Plan ("WP Rev 0") on or by September 2011.

82.     TES developed WP Rev 0 based on the PWS and Draft DP, which was a prerequisite to initiating work on the LLRBS.

83.     TES received four (4) Modifications ("Mods") to DO 0001.

84.     Three (3) of those Mods extended the period of performance eighteen (18) months from September 30, 2011 to March 31, 2013 to allow for completion of the WP Rev 0.

85.     Completion of the WP Rev 0 was dependent upon the USDA receiving NRC approval of the Draft DP.

86.     The Draft DP was not approved by the NRC until December 2012.

87.     TES received Mod P00002 in late November 2012.

88.     Mod P00002 to the Contract was a bilateral Mod issued by the Government acknowledging a two (2) year unexpected delay in the start of site excavation and remediation work as a result of a delay at the hands of the USDA in finalizing the Draft DP and increasing the Contract price by approximately 12.2% for PWS Tasks 2 through 9 based on price escalation.

89.     TES received DO 0003 in early April 2013 about one (1) month after ACC-RI and USDA approval of the WP Rev 0.

90.     DO 0003 authorized TES to begin on-site excavation and remediation work.

91.     TES, accordingly, immediately began pre-mobilization activities and started mobilizing to the LLRBS in early May 2013 to commence on-site excavation and remediation work.

92.     However, the Government issued a Revised PWS on May 9, 2013, which required an additional soil erosion and sediment control plan.

93.     TES subsequently received Amendment 4 to DO 0001 on May 20, 2014 incorporating the Revised PWS and its new requirements.

94.      Submittal of this additional soil erosion and sediment control plan and its approval by the Beltsville Safety, Occupational Health and Environmental Office was necessary prior to the start of on-site soil excavation work in DO 0003.

95.     TES completed plans and submitted the additional soil erosion and sediment control plan in June 2013.

96.     Immediately upon beginning work at the site, TES discovered the representations by Solicitation, Draft DP, and WCS differed materially from actual conditions encountered during performance of the Contract.

97.     During site mobilization, TES carried out an initial gamma scan over the North Field.

98.     This gamma scan indicated the presence of radioactive material in the overburden.

14

99.    The Draft DP and WCS clearly represented there to be five (5) feet of undisturbed and clean overburden on top of the burial pits.

100.    TES could not use the bulk excavation method with the overburden that was outlined in its proposal and accepted by the Government because of radioactive material found in the overburden.

101.    As a result of this differing site condition, TES developed and proposed an alternate site excavation strategy.

102.    This alternate site excavation strategy consisted of removing the overburden material in smaller areas and remediating each pit as it is located and exposed, in lieu of the original site excavation strategy calling for the bulk removal of five (5) feet of clean overburden material across the north field.

103.    The ACC-RI and USDA considered the alternate excavation strategy.

104.    At the request of USDA, group discussions were held with the NRC on July 2, 2013.

105.    The following day the USDA submitted a request to the NRC to amend the Final DP with the alternate excavation strategy.

106.    The NRC indicated its approval with TES' alternative excavation approach by July 18, 2013.

107.    In early August 2014, TES received Mod 02 to DO 0003 incorporating the alternate excavation approach and revised sampling distribution.

108.    TES revised and submitted Revision 1 to the Work Plan ("WP Rev 1") for approval on or about July 25, 2013, which included the newly prepared Erosion & Sediment Control Plan dated June 2013 and the alternate excavation strategy.

109.    WP Rev 1 was approved by the ACC-RI on July 30, 2013.

110.    TES approved and issued WP Rev 1 on August 6, 2013 allowing work site excavation and remediation work to commence.

Site Excavation and Remediation Work

111.    TES began site excavation on August 6, 2013, starting with the removal of overburden at the northwest corner of the North Field.

112.    TES' crews encountered a broad range of waste materials in each of the pits, including dry active waste such as gloves, paper, metals, plastics, laboratory glassware, etc., bulk liquids and other materials in containers, LSVs containing a liquid scintillation cocktail, animal carcasses, and bulk soils that contained waste debris that was not readily separable from the soil.

113.    Many discovered items had elevated radiation readings or high volatile organic compound readings.

114.    In December 2013, TES' work began to be impacted by inclement winter weather.

115.    For instance, TES spent twenty-three (23) work days excavating, sorting, and segregating the waste materials in Pit-25 at an average daily production rate of only 2.5 cubic yards/work day (58 cubic yards/23 work days).

116.    As a consequence, TES' site excavation and remediation work activities were suspended on January 30, 2014 for approximately two (2) months.

16

117.    TES requested the hiatus to allow time for winter conditions to become more amenable for safe and efficient retrieval, sorting, and segregation.

118.    TES received Mod 05 to DO 0003 on January 30, 2014 formally documenting the temporary hiatus of site excavation and remediation work during the months of February and March 2014.

119.    During this period of one hundred seventy nine (179) calendar days of site excavation and remediation work that started back in August 2013, TES excavated and remediated twenty-two (22) pits, including one (1) unplanned pit located between Pit-11 and Pit-12 and labeled Pit-11A, totaling eight-hundred-fifty-three (853) cubic yards (approximately 2 million pounds) of waste materials at an average daily production rate of 8.4 cubic yards/work day (853 cubic yards/101 work days).

120.    TES never envisioned and therefore, did not plan for site excavation and remediation work to be carried out during the winter months.

121.    The need for TES to prepare the site and temporarily suspend site excavation and remediation work due to winter weather in February 2014 and March 2014 is directly attributable to (a) the Government's delays in obtaining approval of the WP Rev 0 that was started in November 2010 and paced by NRC approval of the Final DP, (b) the Government's delays in issuance of DO 0003 until early April 2013, (c) additional requirements by the Government called for in the Revised PWS in early May 2013 requiring an additional soil erosion and sediment control plan prior to starting site excavation that was not approved until July 2013, (d) differing site conditions with the discovery of unexpected contamination in the five (5) foot overburden, and (e) differing site conditions with the discovery of the as-found pit conditions

17

and waste material characteristics that were significantly different from that portrayed in the Solicitation and Draft DP, which necessarily slowed the pace of actual site excavation and remediation work.

122.    TES renewed site excavation and remediation work after the winter hiatus in early April 2014.

123.    Work commenced with the sorting and segregating unprocessed waste material from Pit-25 and Pit-26 that had been placed in a container just prior to the work hiatus.

124.    The next day, TES began locating and taking away overburden, as well as removing a broad spectrum of waste materials surrounded with soil from the Pits.

125.    TES found numerous fifty-five (55) gallon drums holding waste materials, glass bottles, various containers labeled or believed to contain radioactive materials, countless LSVs, medical waste, and animal remains.

126.    TES located the area for Pit-27 in late April 2014 that had been previously excavated during the previous WCS and mislabeled as Pit-34C.

127.    TES also discovered a new pit east of Pit-35 that contained about eight (8) cubic yards of waste material and labeled it Pit-35A.

128.    TES encountered Pit-28 with 107 cubic yards, the largest volume single pit.

129.    During overburden removal operations in mid-May 2014, TES discovering new pits in a row on the south side that were not on the North Field map.

130.    Excavation of waste material from the five (5) new waste pits Pit-47, Pit-48, and Pit-49, Pit-50, and Pit-51 began on or about June 9, 2014.

131.     TES completed excavating and sorting the last pit of waste material from the North Field by approximately June 20, 2014.

132.     TES began the hauling of material to the laydown areas, loading stockpiled waste into shipping containers, bulk packaging of unidentified liquid wastes, and started cleaning up the North Field trailer.

133.     On June 27, 2014, seven (7) days after completing what TES thought was the last pit of waste material, the track hoe pulled up some black plastic sheeting while working to pull the last amount of soil from south east corner of the North Field.

134.     TES discovered this to be an undocumented pit.

135.     The pit, labeled Pit-52, was initially thought to contain about twenty (20) unidentified cylinders.

136.     Because these cylinders were believed to potentially pressurized, they were an unplanned hazardous waste stream.

137.     TES stopped all work in the North Field until a disposition plan was developed and accepted.

138.     TES prepared a plan to address excavating and remediating Pit-52, which was approved on July 9, 2014.

139.     TES proceeded with excavating and remediating Pit-52, ultimately discovering thirty-nine (39) unpressurized cylinders.

140.     These six (6) additional discovered waste pits resulted in TES excavating and remediating an additional seven-hundred-four (704) cubic yards.

141.     TES completed packaging of radioactive waste materials, packaging of unidentified liquids, final engineering surveys, decontaminating and removing most equipment, and demobilizing site operations by August 15, 2014.

142.     During this ninety-eight (98) calendar day second period of site excavation and remediation work that began on April 9, 2014 and ended on August 15, 2014, TES excavated twenty-seven (27) pits containing a total of 1,573 cubic yards (approximately 3.2 million pounds) of waste materials, of which seven (7) pits were newly discovered and unplanned.

143.      The average daily site excavation and remediation production rate was about 59.6 cubic yards/work day (1,573 cubic yards/26 work days), representing a daily production rate that is almost seven (7) times higher than the first six (6) months of site excavation and remediation work.

144.     The daily production rate was higher because TES revised the Work Plan during the winter hiatus to allow transfer of the detailed waste sorting and segregation from the LLRBS to various offsite disposal locations.

145.     This reduced the time and risk of hands-on, labor intensive field waste sorting and segregating work at a premium cost for waste disposal TES was charged by the offsite disposal operators.

146.     In summary, TES excavated forty-nine (49) total pits, of which eight (8) were newly discovered pits totaling 2,367 cubic yards (approximately 5 million pounds) of waste materials.

Differing Site Conditions

147.    During the site excavation and remediation, TES discovered (a) there were more burial pits containing hazardous waste than stated in the Solicitation and Draft DP, which increased the amount and nature of the remediation work, (b) the distribution of the hazardous waste both horizontal and vertical was vastly different than that depicted in the Solicitation and Draft DP, and (c) the nature and extent of the waste, both chemical and radiological, was different than that depicted in the Solicitation and Draft DP.

148.    In clearing the south end of the North Field, TES encountered six (6) unexpected waste pits.

149.    Upon discovery, these pits required careful, directed excavation approach to ensure no significant hazards and/or pressure cylinders existed.

150.    Since TES had planned on rapidly excavating this area to depth, this finding significantly impacted work performance, further extended completing site excavation and remediation.

151.    Altogether, TES discovered eight (8) additional waste pits that had not been shown in the Draft DP or WCS, which increased the amount and nature of TES' work and were a differing site condition.

152.    The Draft DP and WCS represented the waste cells to be 10 ft. wide by 12 ft. long by and 10 ft. deep and separated approximately 6 ft. horizontally from one another.

153.    The Draft DP and WCS also represented waste cells to have five (5) feet of clean overburden.

154.    Accordingly, the Draft DP and WCS represented discrete waste burial pits where the waste has been packaged and could be handled separately.

155.    TES discovered the waste had migrated both vertically into the allegedly clean overburden and through the earth walls that had separated the various burial pits.

156.    Finding waste in the overburden forced TES to develop an alternate technical approach that changed the excavation sequencing from complete one (1) foot lift removal to removal of the cover on a per waste pit basis, thus avoiding cross contamination of clean and contaminated cover soils.

157.    Since some of the waste pits had virtually no clean overburden and the majority had less than two (2) feet of cover, TES was forced to treat all cover soils as potential radioactively contaminated requiring slow and systematic excavation, sorting, and segregation.

158.    Effectively, the lack of the clean five (5) foot cover required TES to treat the entire excavation volume as contaminated and potential containing radioactive waste that increased the schedule for the Zone 1 soils from two (2) weeks to in excess of six (6) weeks.

159.    Additionally, TES found most of the waste pits were greater than 5' in depth with an average depth of 9.5' and some as deep as 14'.

160.    This large vertical distribution of waste virtually eliminated a bulk excavation approach of both the cover and underlying soils significantly impacting TES' proposed and planned schedule and costs.

161.    The discovery of the waste in the overburden and in the interstitial space as noted above was a differing site condition.

162.    The Solicitation and Draft DP depicted in detail a waste known as LSVs.

163.    LSVs were glass ampules containing radioactive isotopes and hazardous organic fluids.

164.    LSVs are considered to be a mixed waste type that is more difficult and expensive to handle and dispose.

165.    According to the Solicitation and Draft DP, only two (2) pits still contained LSVs, and the LSVs were supposed to be packaged, which would make them easier to remediate.

166.    The Solicitation and Draft DP also stated the LSVs were either placed on vial trays and packaged in cardboard boxes or placed in plastic bags and then in cardboard boxes.

167.    TES was particularly concerned about the LSVs because they would require special consideration as they contained mixed waste (radioactive isotopes and organic fluids such as toluene and xylenes).

168.    If the LSVs were breached during excavation, the mixed waste contents would cross-contaminate surrounding soils and other materials.

169.    TES relied on the information about the LSVs in the Solicitation and Draft DP in preparing its proposal.

170.    The distribution and the nature and extent of LSVs found at the LLRBS were significantly greater than described in the Solicitation and Draft DP.

171.    TES found LSVs in thirty-two (32) waste pits, which increased the nature and expense of the remediation.

172.    TES also found LSVs either had been just dumped into the pits or the packaging had broken down spilling the ampules all over the pit.

173.    The LSVs were randomly dispersed in the waste pits and surrounding sidewalls.

174.     These differing site conditions had a significant impact on TES that resulted in dramatically lower excavation and remediation production rates, extended the schedule into winter months, and resulted in TES changing its technical approach to expedite completion of site excavation and remediation.

175.     TES also was forced to significantly increase staffing to address the high concentration of distributed LSVs.

176.     The discovery of the LSVs as noted above were differing site conditions.

177.     TES also discovered thirty-two (32) instances of radioactive materials ("RAMs") when it started the excavation that had not been identified in the Solicitation or Draft DP.

178.     As these RAMs were in sealed and shielded configurations, they could not be safely opened and inspected at the LLRBS.

179.     Therefore, the RAMs had to be characterized as high levels of RAMs or unstable/dispersible physical forms, neither of which were supposed to be at the LLRBS.

180.     TES did not plan for handling RAMs encased in concrete and sealed cylinders that could not be readily opened and investigated for characterization purposes, and furthermore, this type of RAM packaging is typically indicative of high hazard RAM (either by activity or form) that necessitates a higher level of engineering control than was reasonably anticipated for onsite operations.

181.     The additional effort required to exhume, handle, transport, and characterize the high hazard/activity RAMs was not expected.

182.    The Government agreed the RAMS were a differing site condition and provided contract Mod 0010 to DO 0003 for the transport and disposition of the elevated RAMs from the LLRBS.

183.    Mod 0010 covered costs associated with the packaging, transport, and disposal efforts.

184.    However, no consideration was provided for the schedule delays and the additional planning, estimating, and project management costs to exhume and handle these high hazard items.

185.    The discovery of the aforementioned RAMS was a differing site condition.

186.    The Solicitation and Draft DP said nothing about the present of pressure cylinders at the LLRBS.

187.    Consequently, TES had not planned, nor proposed for any excavation, handling, and disposal of pressure cylinders.

188.    TES, however, discovered a new waste pit (Pit 52) with metal cylinders containing unknown gases.

189.    Upon discovery of the previously unidentified waste stream, TES placed the excavation in a safe condition and initiated a stop work so that the condition would not be disturbed.

190.    TES stopped work until it received instruction from the Government.

191.    All thirty-nine (39) pressure cylinders were placed in a safe condition, packaged, and transported off-site for disposal.

49426738.1

192.    The discovery of the aforementioned metal cylinders containing unknown gases was a differing site condition.

193.    Non-radiological contaminates that TES expected to find at the LLRBS were based on the data presented in the Draft DP taken from the WCS conducted to assess conditions in the waste pits and confirm existing assumptions about the nature of the disposals.

194.    Non-radiological soil contaminates identified in the WCS included organic chemicals – chloroform, benzene, bromodichloromethane, and trichloroethylene and metals - arsenic, chromium, and vanadium.

195.    TES planned for small quantities of chemical waste that would be disposed as part of the mixed waste packaging, transport, and disposal waste category line item.

196.    TES reasonably assumed this waste would be able to be laboratory packed on-site and require minimal processing prior to transport and disposal.

197.    During site excavation and remediation work at LLRBS, the actual waste characterization sample results varied significantly from that portrayed in the Solicitation and Draft DP for non-radiological bulk liquid hazardous waste constituents, which caused TES to incur additional waste handling costs.

198.    TES collected a total of thirty-eight (38) drums of liquid waste (excluding liquid scintillation vials) during remediation of the LLRBS.

199.    Since the actual waste characterization sample results varied significantly from the Solicitation and Draft DP, this generated a requirement to obtain new waste treatment and disposition pricing that deviated significantly from TES' estimated pricing.

200.    Laboratory analysis was done on the actual non-radiological bulk liquid hazardous waste.

201.     The chemical data from the actual non-radiological bulk liquid hazardous waste was substantially different from the expected results based on available historical data.

202.    According to the data, the six (6) drums of non-radiological bulk liquid hazardous waste were hazardous and radioactive waste (mixed waste) and required the addition of 9 D Codes (hazardous characteristics according to the Resource Conservation and Recovery Act) above the codes required from the data in the WCS.

203.    The six (6) drums of actual non-radiological bulk liquid hazardous waste were also significantly corrosive, while the anticipated non-radiological bulk liquid hazardous waste previous was not characterized as corrosive.

204.    The current drums had to carry a poisonous hazard in addition to the flammable liquid designation, while the liquid from the WCS did not have to carry this hazard.

205.    These stated differences all support TES' assertion that the hazards associated with the six (6) drums of non-radiological bulk liquid hazardous waste were significantly greater than the waste characteristics reported in the Draft DP and WCS.

206.    The discovery of the aforementioned non-radiological bulk liquid hazardous waste was a differing site condition.

207.    The Draft DP called for all material in the LLRBS area 150 ft. wide x 200 ft. long to be excavated and remediated down to fifteen (15) feet.

208.    The Draft DP represented the in-situ excavated volume was approximately 450,000 ft$^3$ (16,666 CY).

209.    The Draft DP also represented the top five (5) ft. of soil as clean overburden and measured it at 150,000 ft$^3$ (5,555 CY).

210.    The Draft DP claimed 33,000 CF (1,222 CY) of waste material and debris had been buried in forty-six (46) out of a total of fifty (50) waste pits at the LLRBS below the five (5) feet of clean cover.

211.    The supporting documents also stated four (4) of the forty-six (46) waste pits had been excavated during the WCS.

212.    Therefore, TES reasonably anticipated there was approximately 1,040 CY of waste in the remaining forty-two (42) burial pits and each waste pit was expected to be approximately 12 ft. long x 10 ft. wide and 5 ft. deep

213.    The Draft DP also claimed the ex-situ volume of waste material was estimated to be approximately 1040 CY comprised of approximately 600-660 CY (~61%) of waste soil, 200-240 CY (~21%) of contaminated debris, 80-100 CY (~9%) of LSVs, 80-100 CY (~9%) of dry active waste, and 10-12 CY (~1%) of bulk liquids.

214.    The Solicitation stated, "[O]fferors shall assume the following percentages for each waste type apply to the total excavated volume: 81% Contaminated soil/debris/water, 10% Mixed waste, 8% LLRW, and 1% Hazardous Waste. Hazardous only waste is not specifically addressed in the DP. Offerors shall assume an estimated additional 300 cubic yards of contaminated soil containing only hazardous wastes that shall be excavated for disposal."

215.    The actual waste volumes at the LLRBS exceeded these proposed volumes by over 34%

216.    As of August 15, 2014, TES completed the excavation and remediation of forty-nine (49) waste pits in the North Field of the LLRBS.

217.    As noted, TES discovered eight (8) unplanned waste pits (11A, 35A, 47, 48, 49, 50, 51, and 52) resulting in unexpected additional work and waste materials.

218.    TES excavated and remediated forty-one (41) of the planned forty-two (42) waste pits.

219.    One waste pit, Pit 27, had been previously excavated during the WCS and mislabeled at the time as Pit 34C

220.    TES processed 1,386 cubic yards (133.5%) more waste volume than the 1,040 cubic yards called for in the Solicitation and Draft DP and 699 cubic yards (34.5%) more waste volume than the proposed 2,027 cubic yards.

221.    TES had originally planned to remove 16,667 CY of soil, waste, and debris from the LLRBS (150 times 200 times 15/27) during site excavation and remediation.

222.    Based on the final site survey after completion of the site excavation and remediation, TES ultimately excavated and removed more than 17,371 CY from the LLRBS, an increase of 704 CY (~4.2%).

223.    The discovery of the waste as noted above was a differing site condition.

Site Excavation and Remediation Tasks – Anticipated vs. Actual

224.    The Draft DP was definitive regarding the site excavation and remediation tasks to be performed.

225.    Furthermore, the FSS called for more detailed excavation and remediation methods.

226.    Based on the information provided in the Solicitation and its incorporated documents (including the Draft DP and FSS), TES planned and proposed to use a combination of traditional bulk soils excavation and an innovative approach of directed precision excavation to remove waste materials from the pits.

227.    TES planned to self-perform all excavation activities with trained and certified equipment operators using a variety of equipment, sized and configured to ensure the highest level of safety, productivity, and efficiency.

228.    TES would use proper bulk excavation equipment, such as bulldozers, front end loaders, and dump trucks during the removal of overburden, pit sidewalls, and underlying materials.

229.    All direct precision waste pits would be excavated using smaller and more precise backhoe or excavator.

230.    TES was never able to execute the site excavation and remediation work at the LLRBS as it had planned and proposed.

231.    TES incurred significant unplanned delays in the NRC approval of the Draft DP, ACC-RI's requirement for additional Work Plan development, and differing site conditions outlined above.

232.    TES based its proposal on timely NRC approval, development of an approved Work Plan, and mobilization to allow the start of site excavation and remediation work in May 2010.

233.    TES also based its proposal on the subsurface conditions represented in the Solicitation and its incorporated documents.

234.    Site excavation and remediation work did not commence until August 2013, which was thirty-nine (39) months later and due to factors outside the control of TES.

235.    After the start of site excavation and remediation work started in August 2013 using the slower excavation strategy, TES continued to experience differing site conditions.

236.    During the first three (3) months of site excavation and remediation work, TES excavated 12 of the 42 planned waste pits (~29%) and disturbingly discovered uncontainerized LSVs widely dispersed within ten (10) of the waste pits.

237.    The slow, more precise site excavation and remediation work became a more labor-intensive effort and occurred at an even slower pace due to the unexpected presence of the widely dispersed LSVs within the waste pit area and the need for increased safety and caution to avoid breakage and cross-contamination.

238.    These differing site conditions paced the site excavation and remediation work into the winter months until field work was suspended for two months at the end of January 2014.

239.    When work was suspended, TES had remediated only about 50% of the planned waste pits in the first six (6) months.

240.    This slower than planned progress is due to the more precise excavation and remediation methods caused by discovery of waste materials in the top five (5) feet of cover, LSVs in 80% of the waste pits, and LSVs being interspersed instead of in containers.

241.    TES returned to the LLRBS in April 2014 after the winter hiatus to resume site excavation and remediation.

242.    Due slow pace of the work attributable to the differing site conditions (principally the significantly high number and random dispersion of LSVs) experienced in during the first six (6) months, TES changed its approach to the excavation and remediation and revised its Work Plan accordingly.

243.    TES placed most of waste pit debris and materials in containers for transportation to various approved off-site facilities for detailed waste sorting and segregating.

244.    This greatly improved field production rates while reducing the time and safety risks of hands-on, labor intensive field waste sorting and segregating work.

245.    The differing site conditions discovered after award contributed to a significant adjustment in TES' planned approach to site excavation and remediation, substantially lowered the planned production rates, and increased the schedule duration for all but one of the proposed excavation phases.

246.    TES' proposal was based on 1,190 CY/week for excavation.

247.    TES was actually able to excavate 444 CY/week, which is a 746 CY/week difference.

248.    The 63% (746/1190) reduction in excavation rates slowed the pace of the site excavation and remediation work and resulted in the actual duration for site excavation and remediation work to be substantially longer than planned, compounded by a two (2) month work suspension due to winter weather.

49426738.1

Schedule – Anticipated vs. Actual

249.    The original Work Plan by TES had a twenty-four (24) month base line schedule.

250.    This included an extremely time sensitive 120 day work schedule for the remediation, packaging, and transportation of the hazardous wastes.

251.    These time sensitive costs, such as cost of necessary resources including facilities, equipment, dedicated management staff, and field labor, were a direct function of the duration of these respective CLINs.

252.    The original work was initially delayed by over thirty (30) months awaiting the approval of the Final DP by the NRC.

253.    Once the Final DP was approved and TES could start work, the resources were mobilized to the LLBRS.

254.    However, the planned duration and therefore, the costs of these CLINs were impacted by several unplanned factors, including, but not limited to, additional work planning and differing site conditions causing TES to make further unplanned necessary adjustments in its work plans significantly impacting work productivity and also suspend work during the severe winter months of 2014.

255.    As a consequence of these unplanned factors, the actual schedule duration for these CLINs has more than doubled, increasing by at least 173 work days from the planned duration of 120 work days to an actual duration of 293 work days.

256.    The actual duration for these CLINs may increase after completion of geo-probe and backfill work currently being delayed while TES waits for the Government to get the EPA authorization to proceed.

257.    As of the date of this Complaint, the Government still has not received EPA authorization, even though excavation and remediation work has been completed for over four (4) years.

Change to Contract Form

258.    The Contracting Officer ("CO") fundamentally changed the Contract structure beginning with DO 0002.

259.    The Contract was solicited and awarded based on Task 1, 2, 8, and 9 as Firm Fixed Priced ("FFP") tasks.

260.    Tasks 3, 4, 5, 6, and 7 was awarded as Fixed Unit Rates ("FUR").

261.    The Solicitation had asked for a fully burdened FUR per cubic yard including all costs associated with performing the work for these tasks.

262.    The FUR proposed by TES, however, was based on the information provided by the Government in the Solicitation and Draft DP.

263.    The FUR proposed by TES did not account for any of the differing site conditions encountered during performance of the Contract.

264.    DO 0002 added a Task for Public Meeting Support and priced it as a FFP.

265.    This was the first contract administration evidence of a unilateral contract change and an addition of scope of work not included in the Solicitation.

266.    DO 0003 was then issued as FFP, which constituted a unilateral change in the Contract form.

267.    Continuing in this unilateral trend of changing the contract form, Mod 05 to DO 0003 dated January 30, 2014 through Mod 10 to DO 0003 dated March 12, 2015 continued to list SubCLINs 0002AA – 0009AA as FFP.

268.    These actions by the CO have both constructively and effectively changed the Contract from a solicited and awarded contract form of both FFP and FUR to that of a purely FFP form.

First Certified Claim and First Lawsuit

269.    Based on the foregoing, TES submitted a Request for Equitable Adjustment ("REA") to the CO on August 11, 2015.

270.    The REA consisted of nine (9) three-ring binders.

271.    TES attempted to schedule a meeting with the Government to discuss the REA.

272.    One meeting was scheduled, but later canceled by the Government.

273.    No other meeting was scheduled, despite several requests by TES.

274.    In an October 21, 2015 email, TES requested a final decision from the CO.

275.    No final decision was issued by the CO.

276.    TES, therefore, filed a Complaint with the Court of Federal Claims on December 23, 2015, which was Case 1:15-cv-01566-MBH and assigned to the Honorable Judge Horn ("First Lawsuit").

277.    The Government filed its Answer on March 23, 2016.

278.    In the Answer, the Government did not raise any jurisdictional issue.

279.    On May 16, 2016, TES and the Government filed a Joint Preliminary Status Report.

280.    Question (a) in the Joint Preliminary Status Report asked "Does the Court have jurisdiction over the action?"

281.    TES and the Government both represented "[t]he parties know of no reason to question the jurisdiction of the court to entertain this action."

282.    TES and the Government commenced with discovery for several years, especially with numerous depositions taken throughout the United States in the winter and spring of 2018.

283.    The Government did not raise a concern with jurisdiction until a May 25, 2018 Joint Status Report.

284.    However, the Government did not provide any specific argument about a potential lack of jurisdiction in the May 25, 2018 Joint Status Report.

285.    At a Status Conference on June 4, 2018, counsel for the Government outlined for the first time a few specifics about the Government's argument as to a potential lack of jurisdiction.

286.    On June 17, 2018, the Government filed its Motion for Dismiss for Lack of Subject Matter Jurisdiction.

287.    Following a review of the Motion for Dismiss for Lack of Subject Matter Jurisdiction and follow-on research and review of documents, TES believed was enough of a jurisdictional question that it was better to request dismissal of the First Lawsuit without prejudice, re-certify a new claim to the CO, obtain a final decision by the CO, and file a new Complaint in the Court of Federal Claims.

288.    Accordingly, TES filed a Motion for Dismissal Without Prejudice on July 2, 2018.

289.     The Government opposed the Motion for Dismissal Without Prejudice.

290.     Judge Horn granted TES' Motion for Dismissal Without Prejudice on July 9, 2018.

New Certified Claim and Final Decision

291.     On July 19, 2018, TES submitted a new Certified Claim to the CO ("Certified Claim").

292.     The Certified Claim complied with all requirements of the Contract Disputes Act, 41 U.S.C. §§ 7101-09.

293.     The Certified Claim requested a final decision from the CO as to TES' claims that sought compensation in the amount of $7,177,045.68.

294.     The CO timely requested an extension until November 20, 2018 in which to render a final decision.

295.     On November 20, 2018, the CO issued the final decision ("Final Decision").

296.     In the Final Decision, the CO found TES was not entitled to any compensation.

297.     TES files this Complaint within one (1) year of the Final Decision.

298.     All prerequisites necessary to maintain an action pursuant to the Tucker Act, 28 U.S.C. § 1491, and Contract Disputes Act, 41 U.S.C. §§ 7101-09, have been satisfied.

299.     This Court, therefore, has jurisdiction over this action and TES' claims.

## FIRST CLAIM FOR RELIEF
(Equitable Adjustment Based Upon Type I Differing Site Conditions)

300.   TES incorporates the allegations of paragraphs 1 through 299, inclusive, as set forth herein.

301.   TES is entitled to an equitable adjustment of the Contract based upon Type I Differing Site Conditions.

302.   The Contract's Differing Site Conditions Clause states, in relevant part:

> The contractor shall promptly, and before the conditions are disturbed, give a written notice to the Contracting Officer of (1) subsurface or latent conditions at the site which differ materially from those indicated in this contract, or (2) unknown physically conditions at the site, or an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract.

303.   The representations by Solicitation differed materially from the actual conditions encountered during performance of the Contract, especially as to the number of burial pits containing hazardous waste, the distribution of the hazardous waste, and the nature and extent of the hazardous waste.

304.   The actual conditions were reasonably unforeseeable based upon all information available to TES at the time of the Solicitation, including the Draft DP and WCS.

305.   TES reasonably relied upon the representations in the Solicitation, including the Draft DP and WCS.

306.   TES has incurred expenses and costs, in the amount of $7,177,045.68, as a result of the material differences due to additional costs, delays, disruptions, and/or impacts.

307.   TES gave the Government notice of the differing site conditions that was prompt, sufficient, and in writing, the Government knew of the differing site conditions, and/or the

49426738.1

Government has not been prejudiced by any failure to give notice of the differing site conditions, which has been admitted in depositions of the CO and CO's Technical Representative.

308.    TES complied with all procedural requirements necessary for entitlement to an equitable adjustment pursuant to the Differing Site Conditions Clause.

309.    TES has satisfied all conditions precedent to entitlement to an equitable adjustment of the Contract for Type I Differing Site Conditions.

## SECOND CLAIM FOR RELIEF
(Breach of Contract Based on Superior Knowledge)

310.    TES incorporates the allegations of paragraphs 1 through 309, inclusive, as set forth herein.

311.    TES and the Government entered into the Contract.

312.    TES performed all the terms and conditions of the Contract on its part to be performed or was excused from such performance.

313.    The Government breached the Contract based on its superior knowledge.

314.    TES undertook to perform the Contract without knowledge of a fact (or facts) that affected performance costs or direction.

315.    The Government was aware TES had no knowledge of and no reason to obtain such information.

316.    In particular, discovery during the First Litigation showed the Government knew there was waste within the overburden and LSVs were interspersed throughout the subsurface of the LLRBS.

317.    The Solicitation misled TES and did not put TES on notice to inquire.

318.    The Government failed to provide the relevant information to TES.

49426738.1

319.    For instance, the Government did not tell TES there was waste within the overburden and LSVs interspersed throughout the subsurface of LLRBS.

320.    These breaches of the Contract damaged TES in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF
(Breach of Contract Based on Breach of the Covenant of Good Faith and Fair Dealing)

321.    TES incorporates the allegations of paragraphs 1 through 320, inclusive, as set forth herein.

322.    The Contract contained an implied covenant of good faith and fair dealing.

323.    The Government breached the implied covenant of good faith and fair dealing in several instances, including, but not limited to, delaying approval on revised work plans for over two (2) months, failure to coordinate among the various regulatory agencies (NRC, USDA, and EPA) that unduly delayed both the start and the performance of the Contract, withholding approval of WP Rev 2, conditioning approval of WP Rev 2 on acceptance by TES of the CO's conditions with regard to unresolved invoicing issues unrelated to WP Rev 2, and representing to TES that language in Modifications as to waiver or release did not apply to differing site conditions only to later argue such language was a waiver or release.

324.    Based on these breaches of the implied covenant of good faith and fair dealing, the Government breached the Contract.

325.    These breaches of the Contract damaged TES in an amount to be proven at trial.

49426738.1

## FOURTH CLAIM FOR RELIEF
(Equitable Adjustment for Changes)

326. TES incorporates the allegations of paragraphs 1 through 325, inclusive, as set forth herein.

327. The Contract's Changes Clause states, in relevant part:

(a)  The Contracting Officer may at any time, by written order, and without notice to the sureties, if any, make changes within the general scope of this contract in any one or more of the following:

>   (2)  Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the Government in accordance with the drawings, designs, or specifications.

>   (2)  Method of shipment or packing.

>   (3)  Place of delivery.

328. The Government made changes to the Contract through both modifications and constructive changes.

329. The changes were in writing and within the general scope of the Contract.

330. The changes were made by an order, directive, and/or command of the Government.

331. The Government had the authority, pursuant to the Changes Clause of the Contract, to unilaterally or mutually alter TES' duties and obligations under the Contract.

332. As a result of the changes, TES' performance requirements were enlarged.

333. Acting pursuant to the Contract, TES performed the changes.

334. TES also gave the Government notice of changes that was prompt, sufficient, and in writing, and/or the Government has not been prejudiced by any failure to give notice of changes.

41

335.    The changes were not volunteered by TES, but resulted from an order, directive, and/or command of the Government.

336.    The changes increased TES and/or its subcontractors' expenses and costs.

337.    The increases in expenses and costs were the direct and necessary result of the changes.

338.    TES incurred direct expenses and costs as a result of the changes.

339.    Changes also caused TES to incur expenses and costs due to delays, disruptions, and/or impacts.

340.    Changes caused TES delays because of the Government's actions or inactions.

341.    The Government's delays were of an unreasonable length.

342.    These unreasonable delays extended the Contract completion time, and injured TES in the form of additional expense and/or loss.

343.    The Government's changes also disrupted TES' ability to perform according to the Contract, TES' progress, sequence of work, efficiency, and ability to perform the work in the most time and cost efficient manner.

344.    These disruptions were unreasonable and extended the Contract completion time, and injured TES in the form of additional expense and/or loss.

345.    Changes also caused impacts, including, but not limited to, costs of overhead, loss of efficiency, and loss of productivity.

346.    TES has satisfied all conditions precedent to its entitlement to an equitable adjustment of the Contract for changes.

49426738.1

## FIFTH CLAIM FOR RELIEF
(Defective Specifications)

347. TES incorporates the allegations of paragraphs 1 through 346, inclusive, as set forth herein.

348. The Government impliedly warranted the specifications in the Solicitation and its incorporated documents (including the Draft DP and FSS).

349. For instance, the Government impliedly warranted the site excavation and remediation tasks to be performed in the Draft DP and FSS.

350. TES relied on the specifications in the Solicitation and its incorporated documents (including the Draft DP and FSS), including, but not limited to, the site excavation and remediation tasks to be performed in the Draft DP and FSS, in its preparation of its proposal.

351. TES was reasonable in its reliance on the specifications in the Solicitation and its incorporated documents (including the Draft DP and FSS).

352. TES was under no obligation to check or verify the specifications in the Solicitation and its incorporated documents (including the Draft DP and FSS).

353. In fact, TES could not check or verify the specifications in the Solicitation and its incorporated documents (including the Draft DP and FSS) because the Government would not allow any inspection or examination of the LLRBS other than a one (1) site inspection for one (1) hour.

354. The specifications in the Solicitation and its incorporated documents (including the Draft DP and FSS) were defective.

49426738.1

355.    For instance, TES could not perform site excavation and remediation tasks to be performed in the Draft DP and FSS due to the differing site conditions about which the Government had superior knowledge.

356.    As a result of such defective specifications, TES has incurred expenses and costs, in an amount to be proven at trial, as a result of the material differences due to additional costs, delays, disruptions, and/or impacts.

## PRAYER FOR RELIEF

WHEREFORE, TES respectfully requests this Honorable Court to grant the following relief:

a.    As to the First Claim for Relief, declare and adjudge that TES is entitled to an equitable adjustment of the Contract and enter a $7,177,045.68 judgment against the Government.

b.    As to the Second Claim for Relief, declare and adjudge that TES is entitled to all damages permitted for breach of the Contract, including, but not limited to, attorneys' fees, and enter an associated judgment against the Government.

c.    As to the Third Claim for Relief, declare and adjudge that TES is entitled to all damages permitted for breach of the Contract, including, but not limited to, attorneys' fees, and enter an associated judgment against the Government.

d.    As to the Fourth Claim for Relief, declare and adjudge that TES is entitled to an equitable adjustment of the Contract and enter an associated judgment against the Government.

e.    As to the Fifth Claim for Relief, declare and adjudge that TES is entitled to all damages for defective specifications and enter an associated judgment against the Government.

49426738.1

f.      Award interest to TES as permitted under the Contract and/or the Contract

Disputes Act.

g.      Award such other relief as the Court deems just and proper.

DATED:  January 18, 2019

Respectfully Submitted:


*s/ Ryan J. Klein*
Ryan J. Klein
Attorney for TPMC-Energy Solutions
Environmental Solutions Services 2008,
LLC

Sherman & Howard L.L.C.
90. S. Cascade Ave., Suite 1500
Colorado Springs, CO 80903
Telephone:  719-448-4008
Fax:  719-635-4576
Email: rklein@shermanhoward.com

45

**CERTIFICATE OF SERVICE**

Pursuant to Rules of the United States Court of Federal Claims, Rule 4, service of this

Complaint on the United States will be effectuated by the Clerk of the Court.


Respectfully,


*s/ Ryan J. Klein*
Ryan J. Klein

January 18, 2019

49426738.1